**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Audelio ARZOLA–AMAYA, Santiago Rosas–Arzola, Edward V. Maynard, Edison Alvarez, Jorge Humberto Salazar and Jesus Estrada–Hernandez, Defendants–Appellants.**

No. 88–1108.

United States Court of Appeals,
Fifth Circuit.

March 8, 1989.

Charles Louis Roberts, El Paso, Tex., for Audelio Arzola–Amaya & Maynard.

Earl Hanson, Los Angeles, Cal., for Santiago Rosa–Arzola.

Gary B. Weiser, El Paso, Tex., Harold Greenberg, Los Angeles, Cal., for Alvarez.

Luis E. Islas, El Paso, Tex., for Salazar.

Jesus Javier Estrada–Hernandez, Bastrop, Tex., pro se.

Thomas J. McHugh, LeRoy Morgan Jahn, Asst. U.S. Attys., San Antonio, Tex., for U.S.

Before POLITZ and JOLLY, Circuit Judges, and HUNTER*, District Judge.

EDWIN F. HUNTER, Jr., District Judge:

On September 16, 1988, the grand jury for the El Paso Division of the Western District of Texas returned a superseding indictment charging Audelio Arzola–Amaya ("Arzola–Amaya") as a principal administrator, organizer, and the leader of a continuing criminal enterprise, in violation of 21 U.S.C. § 848(b). In addition, all six Appellants, Arzola–Amaya, Santiago Rosas–Arzola ("Rosas–Arzola"), Edward V. Maynard, Edison Alvarez, Jorge Humberto Salazar, and Jesus Estrada–Hernandez ("Estrada–Hernandez") were charged with conspiracy to possess a quantity of cocaine in excess of five kilograms with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count 2), and with the sustantive offense of possession of cocaine with intent to distribute. Appellants Arzola–Amaya, Rosas–Arzola, Alvarez, Salazar and Estrada–Hernandez were also charged with conspiracy to possess marijuana with intent to distribute, as well as the substantive offense of possession of marijuana.

Arzola–Amaya was also charged with subscribing to a false tax return in violation of 26 U.S.C. § 7206(1) (Counts 17, 18 and 19).

All six Appellants were tried together. Each was convicted and sentenced as follows:

Arzola–Amaya, convicted on 18 counts: conducting a continuing criminal enterprise; possession of cocaine with intent to distribute; conspiracy to possess marijuana with intent to distribute; possession of marijuana with intent to distribute; and subscribing to a false income tax return, for a net sentence of life imprisonment, a fine of $1,000,000 and $450 in assessments.

Rosas–Arzola, convicted of conspiracy to possess in excess of five kilograms of cocaine, for which he received a term of imprisonment of seven years and a $50 assessment.

Maynard, convicted on one count of conspiracy to possess in excess of five kilograms of cocaine, for which he received a term of imprisonment of ten years and a $50 assessment.

Alvarez, convicted of possession of more than five kilograms of cocaine with intent to distribute and possession of marijuana with intent to distribute, for a net

---

* District Judge of the Western District of Louisiana, sitting by designation.

sentence of 15 years imprisonment followed by a 5 year special parole term and $100 in assessments.

Salazar, convicted of possession of more than 5 kilograms of cocaine with intent to distribute and possession of marijuana with intent to distribute, for a net sentence of 15 years imprisonment followed by a special parole term of 5 years and $100 in assessments.

Estrada–Hernandez, convicted of conspiracy to possess in excess of 5 kilograms of cocaine; possession of more than 5 kilograms of cocaine with intent to distribute; conspiracy to possess marijuana with intent to distribute; and possession of marijuana with intent to distribute, for a net sentence of 15 years imprisonment followed by a 5 year special parole term and $400 in assessments.

On appeal, each raises myriad grounds for reversal. After examining all of their arguments, however, we find no cause to reverse their convictions and therefore affirm the trial court's judgment.

## THE "ORGANIZATION"—AN OVERVIEW

The indictment and convictions of Appellants arose from the activities of the Audelio Arzola–Amaya drug trafficking organization. The evidence reveals that during the period of time (1980 through 1987), Arzola–Amaya's trafficking of cocaine and marijuana grew from a small one man enterprise into a very large organization, international in scope. Cocaine was its primary commodity. Cash was its main staple. Arzola–Amaya's participation went from cocaine source for street dealers to chief executive officer of a multi-national operation, distributing over 500 kilos of cocaine a month at the time of his arrest.

The government's case included the testimony of Robert Marquez, Albino Renteria, Teresa and William Anchondo, each of whom worked as a cocaine distributor for Arzola–Amaya. Other witnesses corroborated the details of their testimony. The June 1987 Montoya Street incident which the trial judge described as "one of those coincidences that would seem too far fetched if used in fiction"—removed all doubts as to the enterprise and the major participants.

Unfortunately for appellants, the intricate web of illegal activity engaged in by the Arzola–Amaya drug trafficking organization began to unfold in October and November of 1985 when Robert Marquez, an unindicted co-conspirator, contacted the Drug Enforcement Administration ("DEA") by letter from his cell in a Texas Department of Corrections Prison, relating information he possessed. He had been incarcerated following his conviction and sentencing in July of 1985 for delivery of cocaine. The source of this cocaine was Arzola–Amaya. After reading in the newspaper about two large cocaine seizures, and being motivated by fear of further implication in the activities of the Arzola–Amaya organization, Marquez met with DEA agents and informed them that the cocaine confiscated in these seizures belonged to the Arzola–Amaya organization which was "moving" 500 kilos of cocaine a month. Marquez had been associated with Arzola–Amaya since 1978. He paid Arzola–Amaya between $300,000 and $500,000 for cocaine in 1983 and approximately $500,000 in 1984.

In 1980, co-defendant Albino Renteria[1] worked as a television repairman for his uncle, Thomas Marquez. During this same period of time, while residing in Big Spring, Texas, he worked as a cocaine distributor for Arzola–Amaya. Renteria was initially recruited into the narcotics business by his cousin, Tony Marquez, who introduced him to Arzola–Amaya.

Renteria's role in the organization was to act as a courier.[2] His first two trips in-

---

**1.** Albino Renteria entered into a plea agreement with the government to plead guilty to Count Sixteen of the superseding indictment.

**2.** A courier or a "mule" is an individual in a drug trafficking organization whose primary responsibility is to transport or carry narcotics, money or other things of interest to the organization. Generally, a courier or a "mule" does not establish sources of supply or sell the drug.

volved working directly under Tony Marquez. At that time, it appears that the organization was just getting started. Arzola–Amaya tried to borrow money from Tony Marquez to buy a kilogram of cocaine. Tony Marquez refused to give Arzola–Amaya money; he did not trust him.

Some time later, Tony Marquez again approached Renteria and recruited him to transport cocaine directly for Arzola–Amaya. Renteria and Arzola–Amaya met in El Paso. They discussed Renteria's transporting cocaine. Renteria agreed and Arzola–Amaya gave him a piece of paper on which were written his beeper number and the address, "1205 Overland".[3] He was instructed to call upon his return from Miami and to meet again in El Paso.

In 1981, Renteria made his first of many trips to Miami. There, he met Arzola–Amaya's source of cocaine, Colombian drug dealer Armando Ramirez. Ramirez and Renteria wrapped the cocaine and put it in a suitcase with women's clothing. Filling the suitcase with women's clothing was a technique utilized by this group to disassociate the male courier from the cocaine which was secreted inside the suitcase in the event of a seizure or discovery.

Renteria returned to El Paso on the same flight as Ramirez. They sat apart on the plane and never acknowledged one another's presence. They traveled this way so that in the event the courier, Renteria, were arrested, Ramirez would not be associated with him. Once in El Paso, Renteria delivered the cocaine to Arzola–Amaya. The sole basis for the relationship between Renteria and his boss, Amaya, was drug dealing, and Renteria's only involvement in the organization was as a drug courier.

Altogether, Renteria made seven round trips to Miami as a courier for Arzola–Amaya. On these trips, he would generally follow the same modus operandi: take large sums of cash to cocaine sources, Ramirez and later co-defendant German Or-

ozco, in Miami;[4] bring back between one and four kilograms of cocaine, sitting apart from his companion, if any, on the return flights from Miami, and deliver the cocaine to Arzola–Amaya. On one occasion, Arzola–Amaya instructed Renteria to fly to Miami; pick up four kilograms of cocaine; fly back to El Paso; leave two kilograms of cocaine; and take the remaining two kilograms to California. Arzola–Amaya's brother, co-defendant Manuel Rosas Arzola–Amaya, was to sell the two kilograms of cocaine in California for Arzola–Amaya.[5]

About this time, Renteria approached Arzola–Amaya about quitting the organization, but according to his testimony, Arzola–Amaya threatened to kill him if this occurred. Renteria proposed that his sister-in-law, Teresa Anchondo, would be a good candidate to transport drugs in his stead and would take his place. Arzola–Amaya agreed provided Renteria accompanied her on the first trip to Miami. Renteria and Teresa Anchondo made a trip to Miami together in May of 1983 and returned with a suitcase packed with cocaine wrapped in a gauze or fiber glass-like material. The cocaine was delivered to Arzola–Amaya as before. The trip was Renteria's last for Arzola–Amaya, but Teresa Anchondo later made five more trips to Miami. Teresa's son, "Willie" Anchondo, was recruited to accompany her on these trips or go in her place when she was unavailable.

Teresa and Willie Anchondo's participation in Arzola–Amaya's organization did not end with these ventures to Miami. In April of 1985, Teresa was contacted by Arzola–Amaya about making the first of two trips from El Paso to Los Angeles, California. Teresa and Willie Anchondo went with Constana, the pilot, to a ranch southeast of El Paso where two pickup trucks were parked. Attached to the pickup trucks were propane tanks filled with cocaine. The Anchondos drove the trucks

---

**3.** 1205 Overland is the address of a series of small apartments owned by Maynard.

**4.** Usually the courier did not know the exact amount of money he was carrying because the money was often wrapped in black electrical

tape. On one occasion, Renteria did learn that he was taking $70,000 to Miami.

**5.** Manuel Rosas Arzola–Amaya was indicted with but not tried with these Appellants.

to Los Angeles, delivered the keys to Arzola–Amaya's brother Manuel Arzola–Amaya, and flew back to El Paso.

On May 19, 1985, Los Angeles Police Department Narcotic officers observed Manuel Arzola and David Candalaria loading cardboard boxes filled with cocaine into a pickup truck. Surveillance agents followed the pickup truck to a house in Pasadena, California. A search warrant was executed, Manuel was arrested, and 528 pounds of cocaine was seized. This was the largest cocaine seizure on record in the Los Angeles area.

A search warrant was then executed at Rosas Electric, and 13 kilograms of cocaine was seized at this location. During the execution of this search warrant, the officers saw a light blue pickup truck in the garage; this pickup truck bore paper Texas license plates and had a large propane tank attached to its bed. The officers attached no significance to the pickup truck, and when they returned to investigate further, it was not there. In El Paso, Teresa Anchondo continued waiting and making calls to Arzola–Amaya's office, finally going to the law office as she had before. There, Teresa saw Maynard, Escalera and a man in a blue suit. The men were talking about a man named "Flores", who was being detained and how they needed more money and a lawyer in New Mexico. Escalera left the office for a short period of time, and when he returned, he was very excited and said, "They have picked up the truck on Santa Fe. . . . I don't know about you people, but I am leaving. I am going to Mexico."

On July 13, 1985, a pickup truck, driven by Henry Harrison Flores was stopped at the United States Border checkpoint in Almogordo, New Mexico. The pickup truck had a propane tank attached to its bed and bore paper license plates as had been noted regarding trucks carrying prior cocaine shipments. The propane tank was discovered to contain 246 pounds of cocaine. On July 17, 1985, four days later, 263 pounds

of cocaine was seized from inside a propane tank attached to the bed of a pickup truck parked at the El Paso residence of Flores. This truck had been purchased by "J.C. Quinones", an alias sometimes used by Arzola–Amaya. The characteristics of both of these seizures were strikingly similar, down to the handwriting on the cocaine packages. Authorities further discovered among Arzola–Amaya's personal effects a receipt for the purchase of two propane tanks; the numbers on the receipt matched the numbers on the attached tank seized from the El Paso residence.

In April of 1986, Teresa Anchondo was contacted by Escalera, who asked her to drive a motor home to California. Teresa and Willie Anchondo then drove the motor home to Andrews, Texas where they spent the night. The next morning the Anchondos drove to a ranch where the Winnebago was loaded with cocaine, stashed in every conceivable way throughout the motor home. Willie Anchondo estimated the vehicle contained between 1,000 and 2,000 pounds of cocaine. The Anchondos drove the vehicle to Ontario, California. Waiting for them were Arzola–Amaya, Maynard, and Escalera. Rosas–Arzola denies that he was there.

On May 27, 1987 at a United States Border Patrol checkpoint near Yuma, Arizona, $354,000 in cash was seized from a Suburban automobile [6] bound for El Paso from California. Cocaine residue was also discovered in specially modified compartments found in the vehicle. Rosas–Arzola submitted on behalf of Arzola–Amaya and A–Z Productions a "Motion for Mitigation of Forfeiture" for the money seized. Arzola–Amaya claimed the money as his own, and Rosas–Arzola made numerous trips from El Paso to Arizona in regard to this claim.

Arzola–Amaya was under investigation by the El Paso Organized Crime Drug Enforcement Task Force for nearly two years, but it was not until June 1987, when in the words of the Court "by one of those coincidences that would seem too far-fetched if

**6.** This vehicle was registered to an address in Anthony, New Mexico, that Arzola–Amaya has

used.

used in fiction," DEA Special Agent David Petz and his wife, sold their house at 5837 Montoya Street in El Paso, Texas to Arzola–Amaya.

On June 17, 1987, a contract to sell the property was entered into between Mrs. Petz and Cham Property, acting for Arzola–Amaya. Appellant Maynard delivered $40,000 in cash, wrapped in foil. Petz loaned a set of keys to the real estate agent. The keys were given to Maynard.

During the evening of June 22, 1987, and prior to the June 23rd scheduled closing date, Agent Petz and his wife visited the residence on Montoya to make a final inspection and obtain any remaining personal property. In the master bedroom, they found three U-haul cardboard boxes about which they knew nothing. Other than the three U-haul boxes and some cans of black pepper and boxes of corn starch, the house was empty; it did not contain furniture, appliances, or clothing. The Petzes examined the boxes. They discovered several smaller packages wrapped in tape. Believing that these smaller packages might contain a controlled substance, the Petzes immediately left the premises and contacted Ernesto Perez, Resident Agent in Charge of the El Paso DEA office.

The following day, June 23, 1987, before the scheduled closing on the property at 12:00 noon, Agent Petz, along with other DEA agents, returned to the residence to determine whether the packages within the U-haul boxes contained a controlled substance. A sample was taken and upon examination, was found to be cocaine. Twenty-four hour surveillance of the property was initiated and continued for four days.

The sale of the property was finalized. One hour later, surveillance agents observed Arzola–Amaya arrive at the Montoya Street property. He remained for approximately ten minutes, and was observed leaving and talking on a walkie talkie in the front yard. He remained at the scene for a little over an hour, and was followed to his new residence at 502 Leslie Ward Street in El Paso. Two days later, on June 25, 1987, Estrada–Hernandez was also observed at the residence on Montoya Street. He remained there less than an hour.

On June 26, 1986 Estrada–Hernandez, Alvarez and Salazar arrived at the Montoya property in a pickup truck owned by Arzola–Amaya. Estrada–Hernandez was driving. The three men entered the house. Alvarez and Salazar carried U-haul cardboard boxes and a plastic bag into the residence. While Alvarez and Salazar remained inside, Estrada–Hernandez went outside and watered the grass while continuously looking around as though he were conducting "counter surveillance". The three then left the property in Arzola–Amaya's pickup truck, with Estrada–Hernandez driving. They were followed to a gas station near the residence. Estrada–Hernandez made a telephone call. Shortly thereafter, Arzola–Amaya and Rosas–Arzola arrived in Arzola–Amaya's Toyota. Arzola–Amaya transferred to the pickup truck. Alvarez, Salazar and Estrada–Hernandez got into the Toyota with Rosas–Arzola, who was preparing to drive away when all the men were arrested and returned to the Montoya Street residence. A warrant-based and consensual search of the premises was made yielding 415 pounds of cocaine and 19 pounds of marijuana, corn starch boxes, black pepper cans and beer bottles. Salazar's finger prints were found on the boxes and Estrada–Hernandez's on the beer bottles.

## THE ISSUES

1. Whether the evidence adduced at trial is sufficient to sustain the convictions of Rosas–Arzola, Maynard, Alvarez, Salazar, and Estrada–Hernandez.

2. Whether the Court erred in denying appellants' motion to have the jury polled regarding trial publicity.

3. Whether Arzola–Amaya's waiver of his conflict-free representation precludes his successful assertion of an ineffective assistance of counsel claim, and whether his co-appellants have any grounds to complain about not being present at the conflict hearing.

4. Whether a mistrial was mandated for Arzola–Amaya because the name of one of his trial counsel came out during the testimony.

5. Whether Rosas–Arzola, Maynard, Alvarez, and Salazar were entitled to a severance.

6. Whether Estrada–Hernandez' right to a speedy trial was violated.

7. Whether there was error in the court's charge on mere presence.

8. Whether Estrada–Hernandez' Fourth Amendment rights were violated in the search of his person and the house located at 5837 Montoya Street in El Paso, Texas.

9. Whether Estrada–Hernandez is entitled to the vacating of three of his four convictions under the "concurrent sentence doctrine." [7]

### The Sufficiency of the Evidence

■ Rosas–Arzola, Maynard, Alvarez, Salazar, and Estrada–Hernandez assert that the evidence adduced at trial was insufficient to support their convictions. When a challenge is made to the sufficiency of the evidence to sustain an appellant's conviction, the question on appeal is whether there is substantial evidence, viewed in the light most favorable to the government, to uphold a jury's guilty verdict. *United States v. Kaufman*, 858 F.2d 994, 999 (5th Cir.1988); see *United States v. Alvarado Garcia*, 781 F.2d 422, 423 (5th Cir.1986) citing *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978) and *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Stated another way, the question is whether a reasonable jury could find the defendants guilty beyond a reasonable doubt. *United States v. Gardea–Carrasco*, 830 F.2d 41, 43 (5th Cir.1987); *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. 1982) (en banc), *aff'd on other grounds*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). Without restating all the evidence in the "overview", supra, we will review the evidence as to each defendant separately.

### A. Rosas–Arzola

■ To establish Rosas–Arzola's guilty of conspiracy to possess with intent to distribute, as well as the guilt of the remaining appellants as to their own conspiracy indictments, the government must prove beyond a reasonable doubt: (1) the existence of an agreement between two or more persons to violate the narcotics laws; (2) the defendant knew of the conspiracy, and (3) the defendant voluntarily participated in the conspiracy. *United States v. Kaufman*, 858 F.2d 994, 999 (5th Cir.1988); *United States v. Williams–Hendricks*, 805 F.2d 496, 502 (5th Cir.1986); *United States v. Littrell*, 574 F.2d 828, 832 (5th Cir.1978). Each element of the conspiracy charge must be proved beyond a reasonable doubt. No element need be proved by direct evidence, but may be inferred from circumstantial evidence. An agreement may be inferred from "concert of action." *United States v. Vergara*, 687 F.2d 57, 61 (5th Cir.1982). Voluntary participation may be inferred from "a collocation of circumstances." *United States v. Espinoza–Seanez*, 862 F.2d 526 (5th Cir.1988); *United States v. Marx*, 635 F.2d 436, 439 (5th Cir.1981); *United States v. Malatesta*, 590 F.2d 1379, 1381 (5th Cir.1979), *cert. denied sub. nom. Bertolotti v. United States*, 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979).

■ We must first address the argued inconsistency in Rosas–Arzola's conviction of conspiring to possess in excess of five kilograms of cocaine, with intent to distribute, while being cleared of the substantive offenses. In *United States v. Caro*, 569 F.2d 411, 418 (5th Cir.1978), this court stressed the judicial scrutiny to which such a conflict should be exposed:

> In this case, the jury convicted the defendant on a conspiracy charge while acquitting on the substantive offense. There is nothing necessarily inconsistent, in law or logic, with such a result and we

---

**7.** Appellants posit other grounds for reversal, but these lack sufficient merit to justify discussion.

do not hold that a conviction for conspiracy and acquittal of the substantive offense may never properly arise from the same facts and trial. We do suggest however, that such a result should engage our judicial skepticism. A critical analysis of the facts is required when such a contrariety of results does appear. But see *United States v. Heller*, 625 F.2d 594, 597 (5th Cir.1980).

Once we have established the basic contours of the factual situation here we conclude that a rational and fair minded jury could and did find the defendant guilty of the conspiracy charge while acquitting him on the substantive offenses.

In May of 1985 when Teresa Anchondo returned from a cocaine "delivery" trip to Los Angeles, California, Rosas–Arzola was present at the Montoya Street law office with Arzola–Amaya, Maynard, Escalera, Castana, and an unidentified man. Teresa identified Rosas–Arzola as Santiago indicating her familiarity with him. On approximately June 6th or 7th of 1987, Rosas–Arzola arrived in El Paso. He testified that he made the trip to pick up his ten year old car that had been in a traffic accident six months earlier. He says that he learned much to his chagrin that his vehicle was not ready. He remained in El Paso and contacted Arzola–Amaya at A–Z Productions. Rosas–Arzola visited Arzola–Amaya on five or six occasions at the recording studio. It would be difficult to ignore the fact that while waiting in El Paso, Rosas–Arzola made three trips to Phoenix, Arizona to file claims on behalf of Arzola–Amaya for $354,000. This money had been seized from a vehicle in which agents found cocaine residue 85% pure. The automobile containing the cocaine residue was registered to one of Arzola–Amaya's addresses in El Paso. Appellant's uncorroborated explanation of the reasons for his presence in El Paso is inherently implausible. We have previously indicated that "a less than credible explanation" is part of the overall circumstantial evidence from which knowledge may be inferred. *United States v. Richardson*, 848 F.2d 509, 513 (5th Cir.1988).

In June of 1987, Rosas–Arzola met Arzola–Amaya's "people" just after they left 415 pounds of cocaine at the 5873 Montoya Street "stash house." He was in an automobile with Arzola–Amaya, and was preparing to drive away at the time of his arrest. His explanation is that he was visiting Arzola–Amaya and just went along for the ride. He asserts, as he must, that he did not know Alvarez, Salazar and Estrada–Hernandez; no introductions were made; he had no idea where he was driving them; or for that matter, he did not even know his way around the city. This explanation could certainly be unpersuasive to a reasonable juror in light of other evidence. DEA agent Chris Thompson, testified that it appeared Rosas–Arzola was familiar with Estrada–Hernandez, Salazar and Alvarez. No introductions were made. They appeared to know each other. Then too, we have Teresa Anchondo's testimony that when she delivered a Winnebago loaded with 1,000 to 2,000 pounds of cocaine to Arzola–Amaya in California, a man Teresa identified as Rosas–Arzola was there.

We reiterate—our evaluation of the evidence convinces us that a rational and fairminded jury could have found Rozas–Arzola guilty of the conspiracy count beyond a reasonable doubt.

### B. Maynard

■ Maynard played an important role in the conspiracy. He had knowledge of most of its activities. He was identified by four of the prosecution's chief witnesses as an important member of the organization. When Marquez received cocaine from Amaya at the Big Spring, Texas airport, he was there. When Renteria delivered cocaine from Miami to El Paso, he was there. Arzola–Amaya told Renteria and Teresa Anchondo on separate occasions that they would be paid for their courier services as soon as Maynard consummated certain sales. Maynard was the "front man" for the purchase of the Montoya Street "stash house." He tendered $40,000 in cash wrapped in foil to Arzola–Amaya's real estate agent and in return received the keys to the residence. He was observed at the

house, alone, on the day before the seizure of 415 pounds of cocaine.

It is eminently clear that Maynard was Arzola–Amaya's close associate in the conspiracy and the evidence certainly was sufficient for a rational jury to find knowledge, intent, and participation beyond a reasonable doubt.

### C. Estrada–Hernandez, Alvarez and Salazar

■ Appellants Estrada–Hernandez, Alvarez, and Salazar contend the evidence against them was not sufficient, and that, as a result, their convictions should be overturned. After reviewing the record, briefs and oral argument, we disagree with this assessment.

Estrada–Hernandez was identified by Arzola–Amaya's secretary as an associate. He was at the Montoya Street "stash house", alone, on the day before the seizure of the 415 pounds of cocaine. On June 26, 1987, Alvarez, Salazar and Estrada–Hernandez arrived at the Montoya property in a Dually pickup truck. The truck was owned by Arzola–Amaya. Estrada–Hernandez was the driver. The three men entered the house. Alvarez and Salazar carried U-haul cardboard boxes and a plastic bag into the house. Alvarez and Salazar remained inside, Estrada–Hernandez went outside and watered the grass. Alvarez then exited the house, returned to the truck and reentered with a large roll of colored tape. The three left the house, entered the pickup truck and drove away. They were followed to a gas station. Estrada–Hernandez made a telephone call and shortly thereafter, Arzola–Amaya and Rosas–Arzola appeared on the scene, in Arzola–Amaya's Toyota. Rosas–Arzola was the driver. Arzola–Amaya changed over to the Dually pickup truck. The others changed over to the Toyota which Rosas–Arzola was preparing to drive away when all were arrested and returned to the Montoya residence. The agents executed a search warrant. They discovered 415 pounds of cocaine and 19 pounds of marijuana. Among other items seized were U-haul cardboard boxes, rolls of tape, empty cornstarch box-es and empty cans of black pepper. Salazar's fingerprints were found on a cardboard box which contained cocaine. Estrada–Hernandez' fingerprints were found on beer bottles.

These three appellants have presented no competing version of facts either at trial or on appeal which seriously challenges the sufficiency of the evidence to support their convictions.

### Mid–Trial Publicity

■ Appellants contend on appeal that reversal is required because the District Court improperly denied their repeated requests to poll the jury regarding mid-trial publicity. For several reasons we do not agree. The issue was recently addressed in *United States v. Manzella*, 782 F.2d 533, 541–44 (5th Cir.1986), *cert. denied sub nom Jimenez v. United States*, 476 U.S. 1123, 106 S.Ct. 1991, 90 L.Ed.2d 672 (1986). A voir dire should be conducted if "serious questions of possible prejudice" arise. To determine if those questions exist,

> A court must first look at the nature of the news material in question to determine whether it is innately prejudicial; factors such as the timing of the media coverage and its possible effects on legal defenses are to be considered. Second, the court must ascertain the likelihood that the publicity has in fact reached the jury. The prominence of the media coverage and the nature and number of warnings against viewing the coverage become relevant at this state of the inquiry.

Id. at 542 (citing *United States v. Herring*, 568 F.2d 1099, 1105 (5th Cir.1978).

From December 1, 1987, the first day of the trial, through December 15, 1987, a blitz of newspaper articles appeared on the front pages of the El Paso and Juarez newspapers. Headlines appeared on newspapers located in vending machines throughout the downtown area and surrounding the courthouse.

The *Herring* case on which Appellants rely is easily distinguishable from the case before us. In *Herring*, this court found that the trial court's initial cautionary in-

struction regarding publicity was *inadequate* in two respects: First, "particular emphasis or detail [was] placed on ... the ... publicity problem," and second, "it was ... arguable that the text of [the] instruction did not explicitly direct the jury to shun any publicity"; the jury members were merely told to "pay no attention" to any publicity. *See Herring*, 568 F.2d at 1101 & n. 6.

By comparison, in the case now before the Court, the trial court first inquired of the panel at general voir dire whether anyone had heard anything about the case through the news media. After it learned that no one had, the trial court went on to say, "if it suddenly dawns on you that you have heard about it ..., well please go ahead and raise your hand and bring it up then."

The trial court's initial precautionary inquiries occurred at general voir dire when the trial court asked:

Does anyone recall ever having heard anything about this case? In other words have you ever heard about it through the news media, either radio, television, newspapers or whatever, or have you heard about it some other way by someone telling you things or hearing conversations or whatever? If anyone recalls ever having heard anything about the case, please raise your hand at this time. Anyone that remembers ever having heard anything about this case before today, please raise your hand.... *If, during the course of the questioning it suddenly dawns on you that you have heard about it, that you saw something on television or read a newspaper story or anything like that, well please go ahead and raise your hand and bring it up then.*

Again before the presentation of the evidence began, the trial court cautioned the jury that:

There may be during the trial ... publicity about the case in the news media. You are not permitted to read about it in the newspaper and you are not permitted to watch or listen to anything that is broadcast about the trial on television or

radio. So please guard your conduct in that regard and don't slip up and find yourself exposed to any kind of news media publicity about the case at a time that you are serving as a juror.

The record reveals that the conduct of this trial was strictly and correctly controlled. An examination of the newspaper articles reveals that for most part, they followed the trial testimony. The trial judge found that "although there was extensive news media coverage of the trial, most of it took the form of reports of the actual trial proceedings, and these matters had occurred in the presence of the jury in the first place."

The cautionary instructions were made on two separate occasions. The judge was very careful and very specific. These collective admonitions concerning media coverage were adequate safeguards to ensure that appellants received a fair trial free from prejudice.

The indictments leveled many counts, some of which resulted in guilty verdicts and others in not guilty verdicts. The jury's ability to discern a failure of proof of guilt of some of the alleged crimes indicates a fair minded consideration of the issues and reinforces our belief and conclusion that the media coverage did not lead to the deprivation of appellants right to an impartial trial.

## CONFLICT OF INTEREST AND THE DISTRICT COURT'S RESOLUTION OF THAT ISSUE

Appellant Arzola–Amaya argues that (a) he was deprived of effective assistance of counsel because of a conflict between him and his trial counsel, Anchondo; (b) the court did not adequately advise him at his conflict of interest hearing of the consequences of a conflict; and (c) the government was obligated to disclose the details of the conflict and did not do so. The other appellants attempt to capitalize on these arguments, contending that they were prejudiced by Anchondo's continued representation of Arzola–Amaya. However, none of these claims have merit.

The Sixth Amendment guarantees a defendant in a federal criminal trial the right to "counsel reasonably likely to render and rendering" reasonably effective assistance. The guarantee of conflict-free counsel was originally addressed in *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), where the Supreme Court held that, "the Sixth Amendment contemplates that 'assistance of counsel' be 'untrammeled and unimpaired' by a court order requiring that one lawyer shall simultaneously represent conflicting 'interests.'" *Glasser,* 315 U.S. at 70, 62 S.Ct. at 466. The *Glasser* ruling was reaffirmed in *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Mere speculation about a conflict, however, is insufficient to establish ineffective representation. *United States v. Soudan,* 812 F.2d 920, 925–26 (5th Cir.1986), *cert. denied,* 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987); *United States v. Alvarez,* 580 F.2d at 1255 (5th Cir.1978).

Because of the business relationship between Arzola–Amaya and Attorney Anchondo, the government filed a sealed motion asking that an inquiry be made as to potential conflicts of interest. A "conflict hearing" was held on November 23, 1987. Arzola–Amaya, his two attorneys, Esper and Anchondo, were present for this hearing. The district court opined that:

(1) Appellant Arzola–Amaya understood that there was a potential conflict between him and his attorney, Anchondo, and that his attorney's name might come out during the trial of his case;

(2) Appellant Arzola–Amaya was *positive* that he wanted Attorney Anchondo to continue to represent him;

(3) Appellant Arzola–Amaya fully understood and appreciated the [conflict] situation;

(4) Appellant Arzola–Amaya had the opportunity to discuss and did discuss this situation with his attorneys; and

(5) Appellant Arzola–Amaya's decision was conscious and voluntary.

In *United States v. Garcia,* 517 F.2d 272 (5th Cir.1975), this Court reversed the trial court, holding that even if a conflict existed, the defendant had a right to waive the disqualification of the attorneys arising from the conflict. The court then outlined the procedure to be followed by a trial court to assure that a defendant's waiver meets constitutional guidelines. The Court likened the procedure to that promulgated in Fed.R.Crim.P. 11 whereby a court accepts a defendant's plea of guilty. The Court wrote:

As in Rule 11 procedures, the district court should address each defendant personally and *forthrightly advise him of the potential dangers of representation by a counsel with a conflict of interest* ... The court should seek to elicit a narrative response from each defendant that he has been advised of his right to effective representation, that *he understands the details of his attorney's possible conflict of interest and the potential perils of such a conflict,* that he has discussed the matter with his attorney ... and that he voluntarily waives his Sixth Amendment protections. (emphasis added).

Arzola–Amaya must show an actual conflict of interest which *prejudiced* his defense. To meet the Sixth Amendment test, he must demonstrate that his attorney, Anchondo, actively represented conflicting interests in this case, that is—himself and Arzola–Amaya—*and* that this conflict adversely affected Anchondo's performance. *Burger v. Kemp,* 483 U.S. 776, ——, 107 S.Ct. 3114, 3121, 97 L.Ed.2d 638 (1987).

At trial, Arzola–Amaya was represented by two attorneys—Richard Esper and Anchondo. He does not complain that he was inadequately or ineffectively represented by Esper, who was his lead attorney and handled the examination of the majority of witnesses at trial as well as all communications with the government. Esper argued in summation to the jury. Anchondo did not. Arzola–Amaya informed the court that it was his desire to have Anchondo continue to represent him. He also acknowledged that his attorney's name, "Danny Anchondo," could come out at trial. The trial court found that Arzola–Amaya waived any conflict and fully understood and appreciated the situation. The record fully supports these findings. There is little more than this that the court or the

government could have done, short of seeking to remove Attorney Anchondo from the case, against the stated wishes of Arzola-Amaya.

 Maynard, Rosas–Arzola, Alvarez and Salazar each complained that they were prejudiced by the trial court's failure to include them in Arzola–Amaya's conflict hearing. During oral argument, the issue of whether these appellants were informed of Arzola–Amaya's relationship with Anchondo was vigorously disputed. The supplemental record supports the governments position that appellants certainly should not have been surprised when Anchondo's name was mentioned at the trial. They were on notice of the alleged relationship and fully capable of filing appropriate motions. The supplemental record reveals that appellants *were informed* as to Attorney Anchondo's relationship with Arzola-Amaya. His name was mentioned *twenty* times in witness Robert Marquez's five-page statement dated March 27, 1987. Then, too, Attorney Anchondo's law office was identified as a meeting place used by members of Arzola–Amaya's organization. (See statement of Teresa Anchondo.) This Jencks Act material was provided to all defense counsel on November 27, 1987, three days before the trial began on November 30, 1987.

Moreover, appellants have not identified any factual basis for the claim of harm or prejudice from the reference to lawyer Anchondo. This contention is meritless absent prejudice.[8] The reference to Anchondo, as made, was relevant and material. And we find nothing in the record demonstrating that the reference hampered any of the complaining counsel in the representation of their clients.

*Denial of Motions for Severance*

Appellants' complain that the trial court erred when it denied their motions for a severance. We disagree. The basis for this contention is not clear. It is apparently pegged on the Anchondo connection.

 The general rule is that persons who are indicted together should be tried together. *United States v. Harrelson,* 754 F.2d 1153, 1174 (5th Cir.), *cert. denied,* 474 U.S. 1034, 106 S.Ct. 599, 88 L.Ed.2d 578 (1985). Denial of a Rule 14 motion for a severance is reviewable only for abuse of discretion. *United States v. Manzella,* 782 F.2d 533, 540 (5th Cir.1986). Reversal is warranted only when the appellant can demonstrate compelling prejudice against which the trial court was unable to afford protection. *United States v. Manzella,* 782 F.2d at 540, *United States v. Harrelson,* 754 F.2d at 1174.

The evidence here was not so complicated as to prevent the jury from separating the evidence and properly applying it only to those against whom it was offered. There was no unfair prejudice which would compel us to disturb the jury's verdict. The trial court, moreover, explicitly instructed the jury to consider each offense separately and each defendant individually. This instruction sufficiently enabled the jury to "compartmentalize" such evidence and prevent any "spillover" from tainting another appellant's case. Certain appellants were convicted of some counts while others were found not guilty, demonstrating that the jury properly followed the judge's instructions. These appellants were not prejudiced by their joinder with Arzola–Amaya.

---

**8.** Appellants quote as the most damaging portion of Teresa Anchondo's testimony as to Anchondo the following:

Q. Why did you need to get a lawyer in New Mexico?
A. Because this Flores had been arrested.
Q. Had he been arrested—where had he been arrested?
A. At a checkpoint.
Q. So what happens next?
A. Okay, this Felipe leaves the office and is gone for about half an hour. They have papers on top of his desk. They have—We just

all sat there. And then Arzola said to these people, "Now you see why we need Danny (Anchondo) in the District Attorney's office."
Q. Well, let's—
Mr. Roberts: Your Honor, I object and again move for a mistrial on this matter.
The Court: The objection's overruled. She's just relating what went on.
Mr. Hanson: We join in that objection.
Mr. Esper: I renew it as well, Your Honor.
The Court: The objections are overruled. Go ahead.

ESTRADA–HERNANDEZ

Estrada–Hernandez suggests four additional grounds which he argues require setting aside his conviction: (1) his trial did not begin within the time constraints of the Speedy Trial Act, 18 U.S.C. § 3161 et seq. (2) the trial court did not utilize the "mere association" charge requested; (3) that certain evidence introduced was the product of an alleged "illegal arrest and seizure" and (4) the concurrent sentences should not be permitted to stand. We address each contention briefly.

(1) Relevant dates in the instant case include July 29, 1987 when Estrada–Hernandez entered a not guilty plea, and November 30, 1987, the trial date. Estrada–Hernandez' filing of his "Motion for Leave to File Supplemental Motion" on August 7, 1987 began a delay which lasted through the motion hearing on September 23, 1987, and order of October 24, 1987. Only forty-four days of the permissible seventy had elapsed.

(2) We find no merit to the argument that the trial judge erred in not giving the charge that he requested on the "mere association" doctrine. The trial judge did not use the exact language requested, but he clearly, completely and correctly covered this issue in his instructions. We have here a matter of semantics, not substance.

(3) Estrada–Hernandez's convictions were not the product of an "illegal search and seizure and arrest". He refers specifically to the search of the "stash house" at 5837 Montoya Drive in El Paso, Texas and his arrest on June 26, 1987. The burden to prove such a Fourth Amendment violation is upon appellant. *United States v. Parks,* 684 F.2d 1078, 1083 (5th Cir.1982). He must establish that he had a legitimate and reasonable expectation of privacy in the premises which were searched. *Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980). *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). At the risk of belaboring, the obvious, this defendant had no *recognizable* right or interest in the Montoya house. Our analysis could end here, but there is more—there was a valid warrant. As to the arrest-probable cause exists "when the facts and circumstances within the knowledge of the arresting officer and of which he has reasonably trust-worthy information are sufficient in themselves to warrant in a person of reasonable caution the belief that an offense has been committed." *U.S. v. Espinoza–Seanez,* 862 F.2d 526 (5th Cir. 1988). *United States v. Tarango–Hinojos,* 791 F.2d 1174, 1176 (5th Cir.1986), *citing United States v. Woolery,* 670 F.2d 513, 515 (5th Cir.1982), *cert. denied,* 459 U.S. 835, 103 S.Ct. 78, 74 L.Ed.2d 75 (1982). The probable cause was more than adequate. No useful purpose would be served by reiterating the circumstances.

(4) Finally, Estrada–Hernandez seeks the vacating of his convictions under Counts 3, 20 and 21 under the so-called concurrent sentencing doctrine. There is no merit to this contention even if we were to assume that the doctrine has continued vitality. *Ray v. United States,* 481 U.S. 736, 107 S.Ct. 2093, 95 L.Ed.2d 693 (1987).

## CONCLUSION

We are convinced after careful and exhaustive review of the voluminous record that each defendant received a fair trial.

The convictions and sentences imposed are AFFIRMED.