27 F.3d 1035
 UNITED STATES of America, Plaintiff-Appellee,
v.
Melvin Glenn NEAL, Ricky Clyde Duncan, Leslie Raymond Jones,
Clifford P. Sutherland, James Glen Pace, Evelyn Austin
Graham, Timothy Wade Green, Jacky Ronald Pace, Gilbert D.
Smith, Jimmy Wayne Joyce, Defendants-Appellants.
 No. 90-1957.
 United States Court of Appeals,
Fifth Circuit.
 July 21, 1994.
Rehearing Denied Sept. 22, 1994.
 
 George R. Trimber (Court-appointed), Trimber & McAfee, Ft. Worth, TX, for Jones.
 Franklin W. Cram, Arlington, TX (Court-appointed), for Sutherland.
 John F. Taylor (Court-appointed), Cantey & Hunger, Ft. Worth, TX, for Pace.
 George B. Macky, Ft. Worth, TX (Court-appointed), for Graham.
 Stephen Mitchell, Hurst, TX (Court-appointed), for Joyce.
 Stephen M. Stasio, Ft. Worth, TX (Court-appointed), for Green.
 R.H. Wallace, Jr. (Court-appointed), Shannon, Gracey, Ratliff & Miller, Ft. Worth, TX, for Jacky Pace.
 Gerhard Kleinschmidt, Ft. Worth, TX (Court-appointed), for Smith.
 Danny O. Burns, Ft. Worth, TX (Court-appointed), for Duncan.
 David L. Richards, Ft. Worth, TX (Court-appointed), for Neal.
 Joe C. Lockhart, Asst. U.S. Atty., Dallas, TX, Fred Schattman, Asst. U.S. Atty., Marvin Collins, U.S. Atty., Ft. Worth, TX, for appellee.
 Appeals from the United States District Court for the Northern District of Texas.
 Before GOLDBERG, HIGGINBOTHAM, and EMILIO M. GARZA, Circuit Judges.
 EMILIO M. GARZA, Circuit Judge:
 
 
 1
 Defendants Jacky Ronald Pace, James Glen Pace, Melvin Glenn Neal, Ricky Clyde Duncan, Leslie Raymond Jones, Clifford P. Sutherland, Evelyn Austin Graham, Timothy Wade Green, Gilbert D. Smith, and Jimmy Wayne Joyce ("the Defendants") were jointly tried and convicted of various offenses stemming from a conspiracy to manufacture, possess, and distribute amphetamine. All ten defendants were convicted of conspiring to manufacture, distribute, or possess with intent to distribute a controlled substance, in violation of 21 U.S.C. Secs. 841(a)(1) and 846 (1988).[1] All ten defendants now appeal their convictions. We affirm in part, vacate in part, and remand in part.
 
 
 2
 * In 1984 and 1985, Jacky Pace operated an extensive conspiracy to distribute amphetamine. At varying points throughout the conspiracy's existence, Pace recruited the other Defendants into his organization.[2] Pace also established a network of phony corporations ("the JRP group") to purchase the chemicals and equipment necessary to manufacture amphetamine and to launder the money he received from his amphetamine operations. Agents of the Drug Enforcement Administration ("DEA") and the Texas Department of Public Safety ("TDPS") apparently learned of Pace's involvement in the amphetamine trade through surveillance of Metroplex Chemicals, a Dallas business that supplied chemicals and glassware to amphetamine manufacturers.
 
 
 3
 In June 1987, the government brought a forty-three count indictment charging thirty-one persons with various offenses arising out of their participation in Pace's amphetamine distribution ring. The case proceeded to trial in May 1989, but the district court declared a mistrial because of excessive publicity. In October 1989, the case again proceeded to trial, and the jury returned with its guilty verdicts in September 1990.
 
 II
 
 4
 The Defendants first argue that their Fifth Amendment rights to due process were violated by the excessive delay between the occurrence of the last overt act taken in furtherance of the conspiracy and the bringing of the indictment. The Due Process Clause of the Fifth Amendment protects an accused against preindictment delay. United States v. Lovasco, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). To prove a due process violation, the Defendants must demonstrate both that the prosecutor intentionally delayed the indictment to gain a tactical advantage and that the Defendants incurred actual prejudice as a result of the delay. United States v. Delario, 912 F.2d 766, 769 (5th Cir.1990); United States v. Amuny, 767 F.2d 1113, 1119 (5th Cir.1985). Because the Defendants have not attempted to demonstrate that actual prejudice resulted from the delay,[3] and because the record does not support a claim of prejudice, we conclude that the pre-indictment delay did not violate the Defendants' due process rights. See United States v. Harrison, 918 F.2d 469, 474 (5th Cir.1990) (noting that vague assertions of lost witnesses, failed memories, and missing records do not demonstrate actual prejudice).
 
 III
 
 5
 * The Defendants next contend that the district court erred in denying their motions to dismiss based upon alleged violations of the Speedy Trial Act. The Act requires that a federal criminal defendant be tried within seventy days of his indictment or appearance in front of a judicial officer, whichever is later. 18 U.S.C. Sec. 3161(c)(1). If the Act is violated, the indictment must be dismissed. However, the Act provides for a number of exclusions--time that is not charged against the seventy-day clock. See 18 U.S.C. Sec. 3161(h); United States v. Williams, 12 F.3d 452, 459 (5th Cir.1994). It is the Defendants' burden to demonstrate that a violation of the Act occurred. 18 U.S.C. Sec. 3162(a)(2).
 
 
 6
 Here, the Act's clock began to run on November 16, 1987, the day the last defendant appeared before a judicial officer. United States v. Welch, 810 F.2d 485, 488 n. 1 (5th Cir.1987) ("[D]efendants who are joined for trial generally fall within the speedy trial computation of the latest defendant."). At that time, several Defendants already had filed pretrial motions, and pretrial motions of some type remained pending until May 3, 1989.[4] Thus, the trial clock was tolled during that entire time period.[5] See Walker, 960 F.2d at 414 ("Delays resulting from pre-trial motions will toll the trial clock indefinitely; there is no independent requirement that the delay attributable to the motions be reasonable.") (internal quotations omitted). Additional pretrial motions were filed on May 10 and were pending until May 15, when the trial began. Thus, from November 16, 1987 until May 15, 1989, less than one week ran on the Act's seventy-day clock.
 
 
 7
 On May 18, the district court declared a mistrial, thereby resetting the trial clock to zero. 18 U.S.C. Sec. 3161(e). On the same day, Jacky Pace filed a motion seeking an examination to determine his competency. Thus, the period from May 18 until August 25--when Pace was found competent to stand trial--must be excluded. 18 U.S.C. Sec. 3161(h)(1)(A). Moreover, pretrial motions filed by several Defendants were pending until September 20. Thus, only four days had run from the clock when the Defendants' second trial began on September 25. Consequently, no violation of the Speedy Trial Act occurred.
 
 B
 
 8
 The Defendants also allege a violation of the Sixth Amendment. The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy ... trial." The right to a speedy trial "attaches at the time of arrest or indictment, whichever comes first, and continues until the date of trial." United States v. Garcia, 995 F.2d 556, 560 (5th Cir.1993). In resolving a constitutional speedy-trial claim, we must examine: (1) the length of the delay, (2) the reason for the delay, (3) when the defendant asserted his speedy trial rights, and (4) any prejudice to the defendant resulting from the delay.[6] Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Here, the government concedes both that the two-year delay at issue is "presumptively prejudicial" under the first prong of the test and that several of the Defendants asserted their speedy-trial rights "early and fairly often." Therefore, we must balance those factors against the remaining two factors of the Barker test.
 
 
 9
 In examining the reasons for the delay, we must heed the Supreme Court's warning that "pretrial delay is often both inevitable and wholly justifiable." Doggett v. United States, --- U.S. ----, ----, 112 S.Ct. 2686, 2693, 120 L.Ed.2d 520 (1992). This principle is particularly appropriate here, where much of the delay was occasioned by the Defendants' pretrial motions, requests for continuances, and motions for competency examinations.[7] See United States v. Jernigan, 20 F.3d 621, 622 (5th Cir.1994). Moreover, in light of the extremely complex factual nature of the case and the difficulties involved with such a large trial,[8] a sixteen month delay between indictment and trial--or twenty-four months between indictment and the start of the second trial--is not unreasonable. Finally, we must note that the Defendants have not demonstrated that "the [g]overnment ... intentionally held back in its prosecution ... to gain some impermissible advantage at trial." Doggett, --- U.S. at ----, 112 S.Ct. at 2693.
 
 
 10
 We also must weigh the fourth factor--whether the Defendants suffered any prejudice as a result of the delay--against the Defendants. Although affirmative proof of particularized prejudice is not essential to every speedy trial claim, id. at ----, 112 S.Ct. at 2692, the Defendants have alleged neither that they were subjected to excessive pretrial incarceration nor that they were anxious or concerned while awaiting trial. See Garcia, 995 F.2d at 561. Moreover, the Defendants--excluding Glen Pace--have not attempted to demonstrate that the delay impaired their defense. Thus, we reject the Defendants' contention that their constitutional right to a speedy trial was violated. See Doggett, --- U.S. at ----, 112 S.Ct. at 2692 (noting that a constitutional violation is not made out if the defendant cannot show specific prejudice and the government acted reasonably under the circumstances).
 
 
 11
 Glen Pace argues that, as a result of the delay, "he lost his opportunity to present evidence as two witnesses died and his army records were lost." Pace, however, has failed to demonstrate that the allegedly lost evidence impaired his defense to any significant degree. For example, he has not adequately explained either why the facts to which the lost witnesses would have testified could not have been elicited from other witnesses or what relevance his lost army records had to the issues of this case. Moreover, he has not explained why neither he nor his attorney took steps to preserve the witnesses' testimony for trial. See Robinson v. Whitley, 2 F.3d 562, 571 (5th Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 1197, 127 L.Ed.2d 546 (1994). Consequently, we must reject Glen Pace's claim of a speedy-trial violation.
 
 IV
 
 12
 The Defendants contend that significant portions of the transcript have been, or possibly could have been, omitted, thus precluding appellate counsel from examining the record for possible errors. They further argue that the trial transcript is so inaccurate as to render it unreliable for the purpose of appellate review. Thus, the Defendants contend that we should reverse the judgment of the district court and remand for a new trial.
 
 
 13
 * A criminal defendant has a right to a record on appeal that includes a complete transcript of the proceedings at trial. United States v. Margetis, 975 F.2d 1175, 1176 (5th Cir.1992); United States v. Selva, 559 F.2d 1303, 1305 (5th Cir.1977). Where a portion of the transcript is missing and the defendant is represented by the same attorney at trial and on appeal, reversal is required only if the defendant can "show that failure to record and preserve the specific portion of the trial proceedings visits a hardship upon him and prejudices his appeal." Selva, 559 F.2d at 1305. However, "[w]hen ... a criminal defendant is represented on appeal by counsel other than the attorney at trial, the absence of a substantial and significant portion of the record, even absent any showing of specific prejudice or error, is sufficient to mandate reversal." Id. at 1306 (footnote omitted); see also Margetis, 975 F.2d at 1177. Here, using either standard of review,[9] the allegedly omitted portions of the transcript are neither significant nor substantial.[10] See Selva, 559 F.2d at 1306 n. 5 (noting that "a merely technically incomplete record ... will not be sufficient to work a reversal"). Therefore, we find the Defendants' claim of error to be without merit.[11] See United States v. Pace, 10 F.3d 1106, 1124-25 (5th Cir.1993).
 
 B
 
 14
 The Defendants next allege that the transcript is unreasonably inaccurate. A transcript need not be correct in every detail. Instead, it need only "report the proceedings with reasonable completeness and substantial accuracy." United States v. Anzalone, 886 F.2d 229, 232 (9th Cir.1989). We now have before us what has been accepted by the trial court as an accurate transcript. " '[T]hat determination, absent a showing of intentional falsification or plain unreasonableness, is conclusive.' " Margetis, 975 F.2d at 1177 (quoting United States v. Mori, 444 F.2d 240 (5th Cir.), cert. denied, 404 U.S. 913, 92 S.Ct. 238, 30 L.Ed.2d 187 (1971)); see Fed.R.App.P. 10(e). As the Defendants do not allege, and have not demonstrated, intentional falsification, we must examine the transcript and determine whether the district court's decision to certify it as accurate is plainly unreasonable.
 
 
 15
 The Defendants correctly note the district court's finding that the more-than-150-volume transcript contained over 300 errors. After reviewing the transcript, however, we agree with the government's position that these errors, most of which were corrected to the parties' satisfaction by the district judge, were primarily of a typographical nature.[12] Thus, the Defendants have wholly failed to demonstrate that the transcript is unreasonably incomplete or substantially inaccurate. Finally, the Defendants have not demonstrated that any errors in the transcript have caused them specific prejudice, and we do not believe that our review of the claims raised on appeal is impeded in any way by the relatively minor inaccuracies cited by the Defendants.
 
 V
 
 16
 The Defendants[13] contend that the district court erred in denying their respective motions for severance.[14] Denial of a motion for severance is reviewable only for an abuse of discretion.[15] See Zafiro v. United States, --- U.S. ----, ----, 113 S.Ct. 933, 939, 122 L.Ed.2d 317 (1993); United States v. Arzola-Amaya, 867 F.2d 1504, 1516 (5th Cir.), cert. denied, 493 U.S. 933, 110 S.Ct. 322, 107 L.Ed.2d 312 (1989). In reviewing the district court's decision not to grant severance, we must remember the general rule "that persons indicted together should be tried together, especially in conspiracy cases."[16] United States v. Pofahl, 990 F.2d 1456, 1483 (5th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 266, 126 L.Ed.2d 218 (1993). Therefore, "when defendants properly have been joined under Rule 8(b), a district court should grant a severance only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt." Zafiro, --- U.S. at ----, 113 S.Ct. at 938; see also United States v. Buckhalter, 986 F.2d 875, 876 (5th Cir.1993) (defendant must demonstrate compelling prejudice that outweighs "the government's interest in economy of judicial administration"), cert. denied, --- U.S. ----, 114 S.Ct. 203, 126 L.Ed.2d 160 (1993); Arzola-Amaya, 867 F.2d at 1516 ("Reversal is warranted only when the [defendant] can demonstrate compelling prejudice against which the trial court is unable to afford protection.").
 
 
 17
 * Several Defendants allege that they were entitled to severance because their involvement in the conspiracy was extremely limited. These Defendants also contend that the reputations of certain codefendants and evidence of their past crimes created a prejudicial spillover effect. However, a quantitative disparity in the evidence "is clearly insufficient in itself to justify severance." United States v. Harrelson, 754 F.2d 1153, 1175 (5th Cir.), cert. denied, 474 U.S. 1034, 106 S.Ct. 599, 88 L.Ed.2d 578 (1985). "Moreover, the mere presence of a spillover effect does not ordinarily warrant severance." United States v. Sparks, 2 F.3d 574, 583 (5th Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 720, 126 L.Ed.2d 684 (1994). Additionally, because the Defendants were convicted of participating in the same conspiracy, severance is not required merely because the government introduced evidence admissible only against certain defendants. United States v. Restrepo, 994 F.2d 173, 187 (5th Cir.1993). Finally, the jury's "not guilty" verdicts as to some defendants demonstrate that the jurors followed the district court's instructions and considered the evidence separately as to each defendant.[17] See Ellender, 947 F.2d at 755 ("[A]cquittals as to some defendants on some counts support an inference that the jury sorted through the evidence and considered each defendant and each count separately."). Therefore, we reject the Defendants' contentions that the disparity in evidence and the presence of a spillover effect caused compelling prejudice against which the district court was unable to provide protection. See United States v. Faulkner, 17 F.3d 745, 758-59 (5th Cir.1994); Pofahl, 990 F.2d at 1456.
 
 B
 
 18
 The Defendants next argue that severance should have been granted because their defenses were antagonistic with the defense presented by Jacky Pace. It is undisputed that, in some circumstances, "mutually antagonistic" defenses may be so prejudicial as to mandate severance. See Zafiro, --- U.S. at ----, 113 S.Ct. at 937. However, "[m]utually antagonistic defenses are not prejudicial per se. Moreover, Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." Id. at ----, 113 S.Ct. at 938.
 
 
 19
 To support their claim of mutually antagonistic defenses, the Defendants point to comments made by Pace's counsel during his opening statement indicating that Pace was guilty of manufacturing and distributing amphetamine.[18] See United States v. Romanello, 726 F.2d 173, 179 (5th Cir.1984) ("An accusation by counsel can state the core of his client's defense and cast blame on the co-defendant.").[19] The Defendants contend that counsel's "damning" statements "in effect concede[d] to the jury that a conspiracy existed between all the defendants" and caused the jury to "infer[ ] that all the defendants were indeed guilty of participating in the conspiracy," even though they contended at trial that they had not joined or participated in a conspiracy.[20] We do not believe, however, that the comments made by Jacky Pace's counsel indicate that the defense asserted by Pace was necessarily inconsistent with the defense of factual innocence asserted by the other Defendants.
 
 
 20
 "Defenses are antagonistic if they are mutually exclusive or unreconcilable, that is, if the core of one defendant's defense is contradicted by that of another." United States v. Rojas-Martinez, 968 F.2d 415, 419 (5th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 828, 121 L.Ed.2d 698 (1992); see also Romanello, 726 F.2d at 177; United States v. Berkowitz, 662 F.2d 1127, 1134 (5th Cir.1981). Here, Jacky Pace's counsel did not directly assert that the other defendants were guilty of conspiring to manufacture or distribute amphetamine. Cf. Restrepo, 994 F.2d at 186 (severance is proper if a codefendant's out-of-court statements directly implicate the defendant). Instead, counsel admitted only that Pace, with the government's consent, had manufactured and distributed amphetamine. Certainly, the jury, in order to believe the core of that defense, was not required to disbelieve the core of the other Defendants' claims of innocence. See Kane, 887 F.2d at 572 ("The fact that a defendant admits that he is guilty of conspiracy [but claims the defense of entrapment] does not necessarily create a conflict between the core of defenses with a co-defendant who maintains that he is not a member of the conspiracies."); United States v. Salomon, 609 F.2d 1172, 1175 (5th Cir.1980) ("Clearly, a co-defendant's reliance on a theory of entrapment cannot of itself justify reversing a trial court decision not to sever."). Moreover, any risk of prejudice was cured by the district court's limiting instructions that the jury should both consider the evidence as to each defendant separately and individually and not consider comments made by counsel as substantive evidence. See United States v. Stouffer, 986 F.2d 916, 924 (5th Cir.) (similar instructions cured any risk of harm resulting from the defendants' mutually antagonistic defenses), cert. denied, --- U.S. ----, 114 S.Ct. 115, 126 L.Ed.2d 80 (1993); Kane, 887 F.2d at 572 (same).
 
 C
 
 21
 The Defendants next argue that they were entitled to severance because separate trials would have allowed the codefendants to testify for each other. The Supreme Court has recognized that "a defendant might suffer prejudice [from a joint trial] if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial." Zafiro, --- U.S. at ----, 113 S.Ct. at 938 (citing Tifford v. Wainwright, 588 F.2d 954 (5th Cir.1979) (per curiam)). To prevail on such a claim, a defendant must establish a bona fide need for the codefendant's testimony, the substance of the testimony, the exculpatory nature and effect of the testimony, and that the codefendant would in fact testify. Kane, 887 F.2d at 573. Here, the Defendants--excluding Smith and Glen Pace--merely allege that exculpatory testimony would have been available to them had severance been granted. Therefore, the district court properly denied their motions to sever. See Sparks, 2 F.3d at 583 & n. 10 (mere assertions that codefendants would testify for a defendant if severance is granted do not establish grounds for severance).
 
 
 22
 Both Smith and Glen Pace, however, have demonstrated that Jacky Pace--the undisputed leader of the conspiracy--would have testified on their behalf had severance been granted. During the second trial, Smith submitted an affidavit from Jacky Pace in which Pace maintained that Smith in no way helped or participated in Pace's amphetamine business.[21] Additionally, Jacky Pace extensively testified in camera that Glen Pace neither participated in nor in any way intentionally furthered the amphetamine conspiracy. This testimony, quite obviously, is essential to both Smith's and Glen Pace's claims of innocence. Thus, both Smith and Glen Pace have established a bona fide need for Jacky Pace's testimony, the substance of that testimony and its exculpatory nature, and that Jacky Pace would in fact testify. Therefore, we conclude that Glen Pace and Smith should have been tried separately from Jacky Pace. Consequently, we vacate their convictions and remand for a new trial.[22] See Romanello, 726 F.2d at 182.
 
 VI
 
 23
 The Defendants argue that the district court erred in allowing Terry Vernon, an attorney employed by Smith's law firm during 1984 and 1985, to testify in violation of the attorney-client privilege. Vernon testified that Smith invited him to attend a meeting with Duncan, Neal, and a bookkeeper employed by Jacky Pace. Vernon, after reviewing the JRP-group corporate documents presented at the meeting and talking to Duncan and Neal, informed Smith and another attorney that, in his opinion, "this was a money laundering operation, that is was illegal, and that he was not going to get involved in it."[23] The district court assumed that an attorney-client relationship existed between Vernon and the Defendants, but allowed Vernon to testify because the communication to Smith fell within the "crime-fraud" exception to the privilege.[24] Alternatively, the district court found that the Defendants waived the privilege.[25]
 
 
 24
 "The application of the attorney-client privilege is a 'question of fact, to be determined in the light of the purpose of the privilege and guided by judicial precedents.' " In re Auclair, 961 F.2d 65, 68 (5th Cir.1992) (quoting Hodges, Grant & Kaufmann v. United States Gov't, 768 F.2d 719, 721 (5th Cir.1985)). "The clearly erroneous standard of review applies to the district court's factual findings. We review the application of the controlling law de novo." Id. at 69 (citations omitted).
 
 
 25
 Here, the district court assumed that an attorney-client relationship existed between Vernon and the persons present at the meeting. Where the privilege exists, it
 
 
 26
 protects communications from the client to the attorney made in confidence for the purpose of obtaining legal advice. It shields communications from the lawyer to the client only to the extent that these are based on, or may disclose, confidential information provided by the client or contain advice or opinions of the attorney.
 
 
 27
 Wells v. Rushing, 755 F.2d 376, 379 n. 2 (5th Cir.1985) (citations omitted). However, the privilege does not apply where legal representation was secured in furtherance of intended, or present, continuing illegality. Harrelson, 754 F.2d at 1167; see generally Wigmore on Evidence Sec. 298 (McNaughton rev. 1961). Consequently, "once the government has made a prima facie showing that the attorney was retained to promote intended or continuing criminal activity, the privilege may not be asserted." Harrelson, 754 F.2d at 1167; see also United States v. Ballard, 779 F.2d 287, 292 (5th Cir.) (The privilege ceases "when the lawyer becomes either the accomplice or the unwitting tool in a continuing or planned wrongful act."), cert. denied, 475 U.S. 1109, 106 S.Ct. 1518, 89 L.Ed.2d 916 (1986).
 
 
 28
 The Defendants contend that because Vernon did not communicate to Duncan and Neal his conclusion that they were involved in continuing illegal activity, the communication at issue was not "made for the purpose of obtaining aid in the commission of future criminal acts." Therefore, the Defendants conclude that the communication cannot fall within the crime-fraud exception to the privilege. However, the mere fact that an attorney does not agree to participate with a client in criminal activity planned or ongoing at the time the client solicits advice is not dispositive regarding whether the attorney-client privilege can be invoked. See Ballard, 779 F.2d at 292-93 (finding the crime-fraud exception applicable where the attorney refused to participate in intended illegality and so advised the defendant). Instead, the privilege ends when a client consults an attorney seeking advice that will promote intended or ongoing criminal activity. See id. at 292; see also United States v. Dyer, 722 F.2d 174, 177 (5th Cir.1983) (same); United States v. Calvert, 523 F.2d 895, 909 (8th Cir.1975) ("In applying [the crime-fraud] exception to the doctrine of privilege, it is the client's purpose which is controlling...."), cert. denied, 424 U.S. 911, 96 S.Ct. 1106, 47 L.Ed.2d 314 (1976). The district court specifically found that Vernon was approached to render advice that would have aided continuing or future illegal conduct, and this finding is amply supported by the record. Moreover, Vernon expressed his belief--based on information supplied by Duncan and Neal--that the JRP group corporations were an integral part of a money-laundering scheme to Smith, Vernon's employer and a coconspirator. Therefore, we conclude that the district court did not err in allowing Vernon inform the jury that he related to Smith his opinion that the JRP group was part of a money-laundering scheme.
 
 VII
 
 29
 The Defendants next assert they are entitled to reversal because of the prosecutor's alleged misconduct. The acts of misconduct cited by the Defendants consist of violations of discovery rules, improper remarks during the trial, and an improper exhibition of objects during trial that were not placed in evidence. The Defendants further argue that the cumulative effect of the separate acts of misconduct requires reversal. We address each claim in turn.
 
 
 30
 * 1
 
 
 31
 The Defendants contend that the prosecution violated several discovery orders by refusing to provide certain materials and providing other materials after the date ordered by the district court.[26] The district court held a hearing regarding discovery matters in December 1987 and, in late January 1988, ordered the government to make available for inspection all physical evidence and to provide defense counsel with a list of all relevant reports.[27] The prosecution filed a notice of compliance with the court's order in April.[28]
 
 
 32
 Pursuant to Fed.R.Crim.P. 16, which establishes the parameters of discoverable evidentiary materials, "[t]he trial court holds great latitude in the management of the discovery process, including fashioning the appropriate remedy for alleged discovery abuses." Ellender, 947 F.2d at 756. "We review alleged errors in the administration of discovery rules for abuse of discretion and will not reverse on the basis of such errors unless a defendant establishes prejudice to his substantial rights." United States v. Gonzalez, 967 F.2d 1032, 1035 (5th Cir.1992).
 
 
 33
 We conclude that the district court did not abuse its discretion with regard to discovery matters. A review of the record indicates that when the Defendants notified the court of the government's noncompliance with a discovery order or Rule 16, the district court took appropriate action, including granting continuances so the Defendants would have adequate time to examine the disclosed evidence. Additionally, the Defendants have in no way established prejudice to their substantial rights as a result of any alleged error in the district court's administration of discovery rules. Ellender, 947 F.2d at 756.
 
 2
 
 34
 Jacky Pace next challenges the prosecution's failure to timely produce a memorandum criticizing the DEA's handling of the Metroplex Chemical operations. On October 5, 1989, shortly after the second trial had started, Jacky Pace requested that the district court order the government to produce all reports criticizing the DEA's operations concerning several chemical supply stores in the Dallas area. On October 10, the district court directed the government to produce such reports. Because the prosecution did not produce the memorandum until April 1990, Pace contends that the government violated the command of Brady v. Maryland, which held that "the suppression of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good or bad faith of the prosecution."[29] 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963).
 
 
 35
 "To succeed on a Brady claim, a defendant must establish (1) that evidence was suppressed; (2) that this evidence was favorable to the accused; and (3) that the evidence was material either to guilt or punishment." Ellender, 947 F.2d at 756. Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is the probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985).
 
 
 36
 The prosecution produced the memorandum at issue to the Defendants during trial.[30] Thus, the prosecution did not suppress any evidence. United States v. McKinney, 758 F.2d 1036, 1049-50 (5th Cir.1985). Accordingly, we must determine only whether Pace suffered any prejudice as a result of the prosecution's tardy disclosure. Id. at 1050; see also Ellender, 947 F.2d at 757 (holding that "a Brady violation does not require reversal if the defendant was not prejudiced by the nondisclosure and could adequately prepare a defense"). After reviewing the record, we conclude that Pace suffered no prejudice. See Gonzalez, 967 F.2d at 1036 (defendant failed to demonstrate prejudice resulting from the government's failure to disclose certain statements where the statements became known during the government's case-in-chief); Ellender, 947 F.2d at 757 (no prejudice resulted where Brady evidence was produced after the trial started). Pace had the memorandum in advance of Dunn's testimony and, as the record demonstrates, effectively used the memorandum during cross-examination. Moreover, Pace, well in advance of receiving the Dunn memorandum, thoroughly questioned several witnesses about the DEA's involvement with Metroplex Chemicals.[31] Therefore, we reject Jacky Pace's Brady claim. See McKinney, 758 F.2d at 1050.
 
 B
 
 37
 The Defendants further contend that they are entitled to reversal because of certain improper remarks made by the prosecutor at trial. "Improper comments by a prosecutor may constitute reversible error where the defendant's right to a fair trial is substantially affected." United States v. Anchondo-Sandoval, 910 F.2d 1234, 1237 (5th Cir.1990). "The pertinent facts to consider include: (1) the magnitude of the prejudicial effect of the statements; (2) the efficacy of any cautionary instruction; and (3) the strength of the evidence of the defendant's guilt." Id. "A criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone. The determinative question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict." United States v. Iredia, 866 F.2d 114, 117 (5th Cir.), cert. denied, 492 U.S. 921, 109 S.Ct. 3250, 106 L.Ed.2d 596 (1989).
 
 
 38
 The first instance of impropriety cited by the Defendants occurred when the prosecutor remarked during opening statements that some government witnesses were "bad people" because they used drugs. The Defendants argue that this was an indirect comment that they also were bad people. We find nothing inappropriate, however, in allowing the prosecution to inform the jury that several government witnesses had questionable pasts. Cf. United States v. West, 22 F.3d 586, 593 & n. 21 (5th Cir.1994) (not error for government to impeach its own witness by means of his prior felony convictions). Indeed, the government's effort to "pull the sting" was entirely appropriate given here the defense strategy of attempting to impeach several witnesses by questioning them about their prior drug use.[32]
 
 
 39
 The Defendants next challenge the prosecutor's one-time characterization of questions propounded by Jacky Pace's counsel as an "attack," the prosecutor's "lumping" all the Defendants together by using the term "they" when referring to questions asked by counsel for Jacky Pace, and the prosecutor's placing a box labelled "Fred's box of Gilbert D. Smith's baloney" on a table in view of the jury. After each episode, however, the district court, as requested by defense counsel, instructed the jury to disregard the prosecutor's comments. Consequently, we do not believe that these incidents provide any grounds for reversal.
 
 C
 
 40
 The Defendants submit that the prosecutor engaged in misconduct by allowing a government witness to improperly display to the jury a "pouch" containing a syringe and pills seized from Green at the time of his arrest.[33] As the witness had already testified that such items had been seized from Green, we do not believe that allowing the witness to display the pouch constituted reversible error. Cf. United States v. Allie, 978 F.2d 1401, 1408 (5th Cir.1992) (stating that the improper admission of evidence that is merely cumulative constitutes harmless error), cert. denied, --- U.S. ----, 113 S.Ct. 1662, 123 L.Ed.2d 281 (1993). Moreover, the district court appropriately cautioned the jury to disregard the display of the seized items. Consequently, any alleged prejudice was cured. Cf. United States v. Gordon, 780 F.2d 1165, 1175 (5th Cir.1986) (holding that the improper admission of extrinsic evidence could be cured by a limiting instruction).
 
 D
 
 41
 Lastly, the Defendants contend that even if none of the events of alleged misconduct warrants reversal,[34] the cumulative effect of the prosecutor's actions requires a new trial. In support of this assertion, the Defendants cite United States v. Canales, 744 F.2d 413, 430 (5th Cir.1984), for the proposition that "the cumulative effect of several incidents of improper argument or misconduct may require reversal, even though no single one of the incidents, considered alone, would warrant such a result." Although that proposition generally is true, we are not persuaded, in light of the substantial evidence of guilt adduced at trial, that the Defendants are entitled to reversal on the basis of cumulative error. See United States v. Moye, 951 F.2d 59, 63 n. 7 (5th Cir.1992) ("Because we find no merit to any of Moye's arguments of error, his claim of cumulative error must also fail."); cf. Derden v. McNeel, 978 F.2d 1453, 1458 (5th Cir.1992) (en banc) (holding that claim of cumulative error does not entitle state prisoner to habeas corpus relief unless claim of cumulative error refers to errors, rather than mere unfavorable rulings or events, and the errors more likely than not caused a suspect verdict), cert. denied, --- U.S. ----, 113 S.Ct. 2928, 124 L.Ed.2d 679 (1993).
 
 VIII
 
 42
 The Defendants next submit that the district court committed reversible error by not giving a "multiple conspiracy" instruction.[35] The Defendants specifically argue that the evidence presented at trial demonstrated that "a number of conspiracies could have existed other than [the] single conspiracy ... alleged in the indictment."[36] The government argues that there was one and only one overall conspiracy and that the Defendants were parties to that conspiracy. We agree.
 
 
 43
 "Defendants are entitled to a multiple conspiracy instruction when they specifically and timely request such an instruction and their theory of multiple conspiracies is supported by the law and has some foundation in the evidence." United States v. Greer, 939 F.2d 1076, 1088 (5th Cir.1991), reinstated and modified on other grounds, 968 F.2d 433 (5th Cir.1992) (en banc), cert. denied, --- U.S. ----, 113 S.Ct. 1390, 122 L.Ed.2d 764 (1993). Although the district court may decide, as a matter of law, that the evidence fails to raise a factual question for the jury, "a multiple conspiracy instruction 'is generally required where the indictment charges several defendants with one overall conspiracy but the proof at trial indicates that a jury could reasonably conclude that some of the defendants were only involved in separate conspiracies unrelated to the overall conspiracy charge in the indictment.' " Id. (quoting United States v. Anguiano, 873 F.2d 1314, 1317 (9th Cir.), cert. denied, 493 U.S. 969, 110 S.Ct. 416, 107 L.Ed.2d 381 (1989)).
 
 
 44
 We believe that the instructions provided by the district court were sufficient to meet the Defendants' concerns.[37] See id. at 1088-90 (holding that the jury instructions given by the district court were adequate to inform the jury to consider whether each of several defendants joined the conspiracy described in the indictment). The evidence presented to the jury established that the Defendants joined together to pursue a common goal,[38] the nature of the scheme was that of a single conspiracy,[39] and that one pivotal figure directed the illegal activities.[40] See Maceo, 947 F.2d at 1196 ("In determining whether a single conspiracy existed, this Court has examined three factors: (1) the existence of a common goal; (2) the nature of the scheme; and (3) the overlap of the participants."). Additionally, the danger that the Defendants were convicted of participating in a conspiracy different from that alleged in the indictment was minimized by the defenses presented at trial; the Defendants--apart from Jacky Pace--argued that they never entered into any agreement with Jacky Pace to manufacture, possess, or distribute amphetamine. See United States v. Hernandez, 962 F.2d 1152, 1159 (5th Cir.1992) (defense that defendant was not part of any conspiracy minimized the concern that despite demonstrating his lack of involvement in the charged conspiracy, he was convicted because of his association with, or conspiracy for other unrelated purposes with, codefendants who were members of the charged conspiracy). Finally, the district court's refusal to give the requested jury instruction did not seriously impair the Defendants' ability to present a given defense, as all the Defendants were able to argue that they did not agree to participate in any criminal conduct. See id. at 1160 (failure to give multiple conspiracy instruction not reversible error where it did not impair the defendant's ability to present his given defense of innocence). Consequently, the district court did not err in refusing to give the requested multiple conspiracy instruction.
 
 IX
 
 45
 Joyce argues that the district court erred in allowing testimony that police officers, pursuant to a search incident to his arrest, discovered a firearm in the vehicle that he was driving. Officer James Beasley testified that Joyce had "committed" to entering the driveway of an amphetamine laboratory site when he apparently saw officers surveilling it. When Joyce attempted to leave the area, officers stopped his vehicle. While speaking with Joyce, Beasley noticed a "very strong pungent smell of phenylacetic acid[--a chemical used in the manufacture of amphetamine--coming] from inside the vehicle." Beasley testified that he subsequently saw a pistol "wedged down in the seat beside the driver's right leg," and Joyce then was arrested.
 
 
 46
 Joyce failed to object at trial to the testimony that he possessed a firearm when arrested.[41] Therefore, we may reverse only if the admission of the testimony at issue constitutes plain error. See Fed.R.Crim.P. 52(b); United States v. Greenwood, 974 F.2d 1449, 1462 (5th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 2354, 124 L.Ed.2d 262 (1993). After reviewing the record, we are firmly convinced that the introduction of the testimony could not be plain error in light of the overwhelming evidence of Joyce's participation in the charged conspiracy. See United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (noting that "the plain error exception to the contemporaneous-objection rule is to be 'used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result' ") (citation omitted). Accordingly, we need not address the merits of his claim. Greenwood, 974 F.2d at 1463.
 
 X
 
 47
 Lastly, Duncan points out the jury found him guilty of both engaging in a conspiracy in violation of 21 U.S.C. Sec. 846--as charged in count 1 of the indictment--and participating in a continuing criminal enterprise ("CCE") in violation of 21 U.S.C. Sec. 848--as charged in count 5. Duncan contends that participation in a Sec. 846 conspiracy is a lesser-included offense of participation in a Sec. 848 continuing criminal enterprise. The government agrees. See United States v. Devine, 934 F.2d 1325, 1342 (5th Cir.1991) (noting that "a Sec. 846 conspiracy is a lesser-included offense of a Sec. 848 continuing criminal enterprise"), cert. denied, --- U.S. ----, 112 S.Ct. 349, 116 L.Ed.2d 288 (1991). Consequently, the Double Jeopardy Clause requires that we vacate Duncan's conviction and sentence for conspiracy. See United States v. Gonzalez-Balderas, 11 F.3d 1218, 1225 (5th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 2138, 128 L.Ed.2d 867 (1994).
 
 
 48
 Duncan argues that we should not merely vacate his conviction and sentence under Count 1, but also that we should vacate his sentence under Count 5 and remand for resentencing. We agree. The record is unclear as to whether the conspiracy conviction led the trial court to impose a harsher sentence on the CCE count.[42] Consequently, a remand is necessary. See United States v. Michel, 588 F.2d 986, 1001 (5th Cir.1979) (noting that a remand would not be necessary if "it is clear that the conviction for conspiracy did not lead the trial court to impose a harsher sentence on the greater offense than he would have in the absence of the lesser conviction"), cert. denied, 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979); see also Gonzalez-Balderas, 11 F.3d at 1225.
 
 XI
 
 49
 For the foregoing reasons, we VACATE Duncan's conviction for conspiring to possess amphetamine with intent to distribute under Count 1. Additionally, we VACATE the convictions of Smith and Glen Pace and the sentence of Duncan pursuant to Count 5 of the indictment, and REMAND for further proceedings consistent with this opinion. In all other respects, we AFFIRM the judgment of the district court.
 
 
 
 [1]
 Additionally, the jury found Jacky Pace guilty of one count of aiding and abetting the manufacture of amphetamine, in violation of 21 U.S.C. Secs. 841(a)(1) and (2); one count of engaging in a continuing criminal enterprise, in violation of 21 U.S.C. Sec. 848; multiple counts of investing income derived from a drug conspiracy, in violation of 21 U.S.C. Sec. 854; one count of aiding and abetting interstate travel in furtherance of a drug conspiracy, in violation of 18 U.S.C. Secs. 1952 and 2; and one count of conspiring to impede the Internal Revenue Service, in violation of 18 U.S.C. Sec. 371. James Glen Pace was convicted of multiple counts of investing income derived from a drug conspiracy, one count of conspiring to impede the Internal Revenue Service, and one count of using a communication facility to facilitate the conspiracy to manufacture amphetamine, in violation of 21 U.S.C. Sec. 843(b). Neal was found guilty of engaging in a continuing criminal enterprise, multiple counts of investing income derived from a drug conspiracy, and conspiring to impede the Internal Revenue Service. The jury convicted Duncan of engaging in a continuing criminal enterprise, investing income derived from a drug conspiracy, aiding and abetting interstate travel in furtherance of a drug conspiracy, and conspiring to impede the Internal Revenue Service. Smith was found guilty of five counts of investing income derived from a drug conspiracy and one count of aiding and abetting interstate travel in furtherance of a drug conspiracy
 
 
 [2]
 Only defendants Glen Pace and Smith challenge their convictions on sufficiency grounds
 
 
 [3]
 Glen Pace alleges that the loss of witnesses Herbert Wassom and Roy Pace prejudiced his defense. However, were we to find Pace's speculative assertion sufficient to demonstrate actual prejudice, Pace has not refuted the government's contention that the delay was necessary for investigative purposes. Thus, Pace has not demonstrated that the government intentionally delayed the indictment to gain a tactical advantage. See Lovasco, 431 U.S. at 796, 97 S.Ct. at 2052 (prosecuting "a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time")
 
 
 [4]
 The Act provides for the exclusion of "[a]ny period of delay resulting from other proceedings concerning the defendant, including ... delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion...." 18 U.S.C. Sec. 3161(h)(1)(F). Here, the Defendants attack the exclusion of time during which motions were pending as unjustified. Nonetheless, the Act is "all but absolute" in excluding time during which motions are pending. United States v. Walker, 960 F.2d 409, 413 (5th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 443, 121 L.Ed.2d 362 (1992); United States v. Horton, 705 F.2d 1414, 1416 (5th Cir.), cert. denied, 464 U.S. 997, 104 S.Ct. 496, 78 L.Ed.2d 689 (1983). Moreover, the Defendants have failed to demonstrate that this a particularly egregious case justifying an exception to the Act's command. See Horton, 705 F.2d at 1416 (noting that an exception might be justified where the defendant has presented "repeated unsuccessful requests for hearing or other credible indication that a hearing had been deliberately refused with intent to evade the sanctions of the Act")
 
 
 [5]
 We further note that Joyce and another defendant filed a motion for continuance, which the district court, based upon its finding that the ends of justice so required, granted on January 25, 1988. See 18 U.S.C. Sec. 3161(h)(8)(A) (excluding any period of delay resulting from a continuance granted on the basis of the court's finding that the continuance served the "ends of justice"). Two days later, the court set the case for trial on September 7, 1988. On September 1, however, the district court again granted a continuance based upon the ends-of-justice analysis. On October 4, the court set a new trial date of May 1, 1989
 
 
 [6]
 In assessing prejudice, we must look to the policies underlying the Sixth Amendment's guarantee of a speedy trial: "(i) preventing oppressive pretrial incarceration; (ii) minimizing a defendant's anxiety and concern; and (iii) assuring that a delay does not impair the defense." Garcia, 995 F.2d at 560
 
 
 [7]
 We note that Joyce sought a continuance as late as May 13, 1989, which the district court denied
 
 
 [8]
 The Defendants contend that we should weigh any delay caused by the number of defendants against the government due to the government's desire to "bring[ ] a mega show trial." However, the Defendants concede that initial joinder was proper
 
 
 [9]
 On appeal, Jones, Neal, Joyce, and Duncan are represented by new counsel
 
 
 [10]
 For example, it is undisputed that the transcript inaccurately reports that the district court, in response to a defense objection to the admission of certain evidence, stated, "You ain't going to be putting the evidence in by me, buster." The Defendants therefore contend that "whatever explanation [the court] may have offered as to why he admitted the evidence ... is missing." However, the transcript relates that the district court admitted the challenged evidence "because it was made from the [witness's] knowledge. It was a summary and I don't want to argue about it. It's admitted."
 
 
 [11]
 Glen Pace alleges that testimony given in camera by Jacky Pace regarding the testimony that Jacky would have given had Glen Pace's trial been severed from his own is not included in the record on appeal. That assertion is incorrect. See part V.C. infra
 
 
 [12]
 For example, volumes 82 and 88 of the record on appeal, although purporting to transcribe the same proceeding, contain different language. However, as even the Defendants admit, the cited volumes are "quite similar," and we do not see how the de minimis discrepancies render the transcript unreasonably inaccurate
 
 
 [13]
 In this section, "the Defendants" excludes Jacky Pace
 
 
 [14]
 Fed.R.Crim.P. 14 provides:
 If it appears that a defendant or the government is prejudiced by a joinder of ... defendants ... for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.
 
 
 [15]
 Although we have expressed serious concerns regarding criminal megatrials, United States v. Ellender, 947 F.2d 748, 754 (5th Cir.1991), "[m]ere generalized criticism of megatrials [by defendants] generally will not withstand the rigorous standard of review for denial of severance." Id. at 755
 
 
 [16]
 Thus, the Defendants agree that joinder initially was proper. See Fed.R.Crim.P. 8(b)
 
 
 [17]
 The jury found Neal not guilty of the criminal acts alleged in counts 25-31; Jacky Pace not guilty of counts 3 and 41; Glen Pace not guilty of count 5; Sutherland not guilty of counts 3, 5-31; and Smith not guilty of counts 6-26 and 43
 
 
 [18]
 During his opening statement, Pace's counsel remarked that Pace did "not dispute committing the acts of purchasing chemicals, manufacturing amphetamine, and participating in the sale of amphetamine." Continuing, counsel stated that "Jacky Pace did precisely what [the government] said that he did in this Indictment insofar as manufacturing and selling amphetamine." In admitting his guilt, Pace rested his defense at trial on his claim of outrageous government conduct. Pace argued to the jury that the DEA tacitly consented to his activities by allowing him to repeatedly purchase the chemicals required for manufacturing amphetamine as part of its plan to identify the "major" drug dealers in the Dallas-area
 
 
 [19]
 But see United States v. Kane, 887 F.2d 568, 572 (5th Cir.1989) ("Any direct comment on the existence of a conspiracy made in support of [an entrapment] defense was propounded by counsel for [codefendant]. However, statements by counsel are not evidence at trial...."), cert. denied, 493 U.S. 1090, 110 S.Ct. 1159, 107 L.Ed.2d 1062 (1990)
 
 
 [20]
 The Defendants also contend that Pace's counsel referred to the codefendants as "kingpins." We disagree. Counsel did not refer to the codefendants as kingpins, but instead argued that the government made Jacky Pace into a drug kingpin by allowing him to manufacture amphetamine:
 In summary we're going to try to show you that when after lo, those many years when the DEA and other law enforcement agencies permitted Mr. Pace's activities to go on, that when they finally got around to indicting him in June of '87 it was hailed as a big case for the Drug Enforcement Administration and the United States Attorney's Office. That's the only answer that I can give you as to why those agents would permit that type of activity to go on, not out of ill motive, not out of ill served sense of what their purpose is, but simply because in their zeal to try to make the kingpins, they did indeed, ladies and gentlemen, make the kingpins. And if Jacky Pace is a kingpin as he sits here before you today[,] by the time this trial is over with we're going to show you that it's because the Drug Enforcement Administration made him that.
 
 
 [21]
 Jacky Pace averred that Smith: "did not obtain or deliver for [Pace] any glassware, chemicals or other items necessary for producing amphetamine"; "did not sell any amphetamine for [Pace]"; did not "commit[ ] any act in furtherance of any amphetamine manufacture, sale or distribution in which [Pace] participated"; "was not a part of the 'Pace Organization' "; "did not enter into any agreement, partnership or association ... to manufacture, distribute or sell or to possess with intent to distribute or sell amphetamine"; and was retained by Pace only "as an attorney at law."
 
 
 [22]
 Thus, we find that the evidence presented below was sufficient to support a verdict against them and need not address their other individual claims of error. See Romanello, 726 F.2d at 176-77 & n. 4
 
 
 [23]
 The Defendants do not contend on appeal that Vernon's testimony regarding the corporate structure of the JRP group or the documents that he examined during the meeting involved privileged communications. See Joint Brief at 70 ("The communication divulged by Vernon in the instant case is singular: Vernon's alleged communication to [Smith and Cordes]....")
 
 
 [24]
 We note that the better route would have been for the district court to determine first whether an attorney-client relationship existed and, in the alternative, decide issues involving exceptions to or waiver of the privilege. See Harrelson, 754 F.2d at 1167 (noting that a defendant asserting the privilege "bears the burden of proving the existence of an attorney-client relationship"); In re Grand Jury Proceedings, 517 F.2d 666, 670 (5th Cir.1975) (To satisfy its burden, the defendant must demonstrate that the holder of the privilege made the communication at issue to a person acting as a lawyer for the primary purpose of securing "either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding."). We, of course, express no view as to whether an attorney-client relationship existed between Vernon and the Defendants
 
 
 [25]
 The Defendants initially argue that these findings are clearly erroneous because the district court originally ruled that the communication at issue was privileged, but that the privilege was waived. We find nothing erroneous, however, about the district court's decision to clarify the record by stating the exact reasons why it admitted the testimony in question
 
 
 [26]
 The Defendants also contend that the prosecution's failure, prior to trial, to produce certain reports and statements prepared by government agents violated the Jencks Act. The Jencks Act provides in relevant part:
 After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement ... of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified....
 18 U.S.C. Sec. 3500(b) (emphasis added). Thus, the Jencks Act does not require that the prosecution disclose such reports prior to trial. See United States v. Campagnuolo, 592 F.2d 852, 858 (5th Cir.1979) (holding that a pretrial discovery order was invalid to the extent that it allowed discovery beyond the limitations of the Jencks Act), cited with approval in United States v. Welch, 810 F.2d 485, 489 n. 2 (5th Cir.1987).
 
 
 [27]
 Prior to the hearing, the government provided defense counsel with access to discoverable evidence using a "discovery room" into which it placed all tangible evidence. See United States v. Kenny, 462 F.2d 1205, 1212 (3d Cir.1972) (holding that the defendants had an adequate opportunity to inspect tangible evidence where the government simply placed it in a room open to the defendants), cert. denied, 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972)
 
 
 [28]
 The prosecution sought additional time to comply with the portion of court's order directing it to (1) "designate by April 18, 1988 those documents which it does not intend to introduce into evidence," (2) "segregate and identify, by April 25, 1988 those documents, excluding investigative reports, in which a specific defendant is mentioned by name," and (3) provide copies of the latter documents to defense counsel
 
 
 [29]
 The other Defendants contend that the tardy disclosure of the memorandum constitutes evidence of prosecutorial misconduct in that if the memorandum would have been available earlier in the proceedings, it would have supported Jacky Pace's defense and the district court would have granted their motions to sever. However, the district court's decision to deny the severance motions did not turn on the credibility of Pace's defense, but rather that his defense was not mutually antagonistic with the claims of innocence made by the other Defendants
 
 
 [30]
 As it turned out, the government's case agent, TDPS Lieutenant Mike Dunn, authored the memorandum
 
 
 [31]
 As his brief recognizes, "the trial court allowed counsel for Defendant [Jacky] Pace to delve into matter of the DEA and DPS involvement in operating chemical and glassware supply houses...."
 
 
 [32]
 The Defendants also submit that the prosecutor engaged in misconduct by arguing the case during his opening statement. After reviewing the cited pages of the record, we conclude that the prosecutor did not argue the case during opening statements. Instead, the prosecutor merely informed the jury what he believed the evidence would demonstrate
 
 
 [33]
 The pouch had not been, and was not, admitted in evidence
 
 
 [34]
 Indeed, the Defendants appear to concede this point. See Joint Brief at 60 ("Where, as here, prosecutorial misconduct does not directly violate a criminal defendant's rights....")
 
 
 [35]
 The Defendants preserved this error by requesting such an instruction at trial
 
 
 [36]
 At times, it appears as if the Defendants contend that the evidence was insufficient to support their convictions for conspiracy. For example, they allege that "[n]o agreement was proven to exist between [them]." However, the jury, in convicting them of conspiracy, specifically found the existence of such an agreement, and that finding is supported by the evidence
 
 
 [37]
 The district court instructed the jury:
 Two essential elements are required to be proved beyond a reasonable doubt in order to establish the offense of conspiracy charged in the Indictment:
 
 
 [1]
 That two or more persons in some way or manner, positively or tacitly, came to a mutual understanding to try to accomplish a common and unlawful plan, as charged in the Indictment,
 
 
 [2]
 That the defendant willfully became a member of such conspiracy
 ....
 The Indictment charges a conspiracy between the named defendants and others, both named and unnamed.... [Y]ou cannot find a defendant guilty unless you find beyond a reasonable doubt that the defendant participated in a conspiracy as charged with at least one other person, whether named or not, as charged in the Indictment.
 In your consideration of the conspiracy offense as alleged in the Indictment, you should first determine, from all of the testimony and evidence in the case, whether or not the defendant under consideration wilfully became a member of such conspiracy.
 If the jury should find from the evidence beyond a reasonable doubt that the conspiracy charged in the Indictment existed, and that the defendant under consideration and at least one other person were members of the conspiracy, then proof of the conspiracy is complete; and it is complete as to every person found by the jury to have been willfully a member of the conspiracy at the time alleged in the Indictment.
 
 
 [4]
 R. at 557-60 (emphases added)
 
 
 [38]
 A common purpose exists in a plan to derive personal gain through the manufacture and distribution of amphetamine. See United States v. Maceo, 947 F.2d 1191, 1196 (5th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1510, 117 L.Ed.2d 647 (1992)
 
 
 [39]
 We have stated that
 [w]here the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme or to the overall success of the venture, where there are several parts inherent in a larger common plan, ... the existence of a single conspiracy will be inferred.
 United States v. Elam, 678 F.2d 1234, 1246 (5th Cir.1982). The nature of the conspiracy here was that members had different tasks, but all activities certainly were advantageous to the success of the scheme. For example, Duncan, who was once an amphetamine retailer for Pace, and Neal managed two corporations designed to both provide chemicals necessary to manufacture amphetamine and launder funds received as a result of the sale of amphetamine. Sutherland both sold amphetamine and participated in the Pace organization's money laundering activities. Joyce helped to manufacture amphetamine for the organization, and Jones collected money owed by purchasers and retailers of amphetamine to the organization. Additionally, the evidence demonstrated that Green was an amphetamine retailer and Graham, among other things, stored amphetamine for the organization. See United States v. Richerson, 833 F.2d 1147, 1154 (5th Cir.1987).
 
 
 [40]
 "A single conspiracy exists where a 'key man' is involved in and directs the illegal activities, while various combinations of other participants exert individual effort toward a common goal." Richerson, 833 F.2d at 1154. Here, Pace unquestionably was the "key man" who directed the activities of the other conspirators. See Maceo, 947 F.2d at 1197; Richerson, 833 F.2d at 1154
 
 
 [41]
 To the extent Joyce's claim of error can be construed a challenge to Beasley's subsequent testimony that Joyce was arrested for possessing the pistol, Joyce again failed to lodge a contemporaneous objection
 
 
 [42]
 Duncan was sentenced to concurrent terms of imprisonment of sixty years on the CCE count and fifteen-years on conspiracy count. On the other counts of conviction--investing income derived from a drug conspiracy, aiding and abetting interstate travel in furtherance of a drug conspiracy, and conspiring to impede the Internal Revenue Service--Duncan received terms of ten years, five years, and five years, all to run concurrently with the CCE sentence